**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHANE N TOWNSEND,** | : | |
| | : | |
| **Petitioner** | : | |
| | : | **CIVIL NO. 3:CV-12-0636** |
| **v.** | : | |
| | : | **(Judge Caputo)** |
| **WARDEN, FCC LEWISBURG,** | : | |
| | : | |
| **Respondent** | : | |

**M E M O R A N D U M**

**I.    Introduction**

Petitioner Shane Townsend is a federal prisoner presently incarcerated at the
Allenwood United States Penitentiary in White Deer, Pennsylvania.  On March 28,
2012, Mr. Townsend filed this Petition for Writ of Habeas Corpus pursuant to 28
U.S.C. § 2241,[1] to challenge a decision issued by a Disciplinary Hearing Officer
(DHO) finding that he violated Bureau of Prisons (BOP) regulations which resulted in
the loss of good conduct time.[2]  He seeks expungement of the incident report and
the restoration of his good time credits.  The petition is ripe for disposition.  Also
pending before the Court are two motions for temporary restraining orders filed by

---

[1]  For the convenience of the reader of this document in electronic format, hyperlinks
to authority cited have been inserted.  No endorsement of any provider of electronic
resources is intended by the Court's practice of using hyperlinks

[2]  Mr. Townsend was housed at the Coleman Federal Correctional Complex (FCC) in
Coleman, Florida, when he was charged with killing his cellmate.  He filed the present
petition while housed at the United States Penitentiary in Lewisburg, Pennsylvania.  (Doc. 1,
Pet.)

Mr. Townsend seeking to prevent the BOP from transferring him to a facility outside the Middle District of Pennsylvania prior to the resolution of his petition. For the reasons that follow, the petition for writ of habeas corpus will be denied as well as Mr. Townsend's motions for preliminary injunction.

## II.    Background

On April 20, 2011, Lt. Taylor issued Mr. Townsend an Incident Report charging him with "Killing," a violation of BOP Code No. 100. Specifically, the Incident Report alleged the following:

> In conclusion of an SIS Investigation on April 20, 2011, it was determined that on January 12, 2011, at approximately 5:50 a.m., the J-1 Unit Officer activated his body alarm when he observed a physical altercation taking place between inmates Piankhi-Shabaka, Wo'se Reg. No. 03086-000 and Townsend, Shane, Reg. No. 13736-041. Specifically, staff observed inmate Piankhi-Shabaka swing a sock with an unknown object at Inmate Townsend. Both inmates then grabbed each other and continued to wrestle on the floor. Responding staff separated the inmates and placed them in hand restraints. Inmate Townsend was escorted to the Lieutenant's Office holding cell were he was medically assessed by Health Services staff. Inmate Piankhi-Shabaka was escorted to Health Services to be medically assessed by Health Services staff. During the assessment, Health Services staff noted inmate Piankhi-Shabaka was unresponsive and not breathing. Life saving measures were performed by medical staff until EMS services arrived at approximately 6:42 a.m. The EMS administered life saving procedures which was met with negative results. At approximately 7:01 a.m. inmate Piankhi-Shabaka was pronounced deceased by the On-call Emergency Room Medical Doctor. The autopsy report by the Medical Examiner concluded the cause of death was asphyxia, due to neck compression.

(Doc. 11-2, Respondents' Exs. at ECF p. 15.)

The following day Mr. Townsend appeared before the Unit Disciplinary Committee (UDC). (Doc. 11-2 at ECF pp. 15-18.) He told the members UDC that

after inmate Piankhi-Shabaka attacked him with boiling water and a lock in a sock, they "wrestled a bit" while he tried to keep inmate Piankhi-Shabaka away from him. He stated his actions were in "self defense" and that he "did not attack" Piankhi-Shabaka.  (*Id*. at ECF pp. 15-16.)

Due to the seriousness of the offense, the UDC referred the incident to the DHO for resolution.  (*Id*. at ECF p. 15.)  The UDC did not reach a determination whether Mr. Townsend had violated BOP regulations, and the UDC administered no punishment on that day.  Mr. Townsend was given notice of the hearing scheduled before the DHO and advised of his rights with respect to that hearing.  (*Id*. at ECF pp. 36-37.)  At that time, Mr. Townsend indicated he did not wish to call any witnesses on his behalf but he did request the assistance of a staff representative, Mr. Rossignol.  (*Id*. at ECF p. 36.)  Mr. Rossignol received written notice of his duties as a staff representative.  (*Id*. at ECF p. 38.)  He was advised that his "role is to help the inmate present the best defense possible to the charged violations," "consult[ ] with the inmate," and be familiar "with all reports relative to the charge against the inmate."  (*Id*. at 38.)  He was advised to "present any evidence favorable to the inmate's defense", and that he may request "additional time" to prepare for the hearing if needed.  (*Id*.)

On April 29, 2011, DHO Lane conducted Mr. Townsend's disciplinary hearing.  (*Id*. at ECF pp. 8- 12.)  As requested, Mr. Rossignol appeared as his representative.  (*Id*. at ECF p. 8.)  Mr. Townsend did not call any witnesses or present any documentation in his defense. (*Id*. at ECF p. 9.)  At the outset of the

hearing, Mr. Townsend confirmed he understood his due process rights and that both he and Mr. Mr. Rossignol "stated [they] were ready to proceed". (*Id.*)

Mr. Rossignol testified that he reviewed the video footage of the incident. (*Id.* at ECF p. 10.) He then described the events of the video. He reported seeing inmate Piankhi-Shabaka heat something in the microwave and place something "in [his] waist". (*Id.* at ECF p. 10 and p. 20.) After retrieving something from the microwave, inmate Piankhi-Shabaka walked with increasing speed towards the ice machine while raising his right arm as if he was going to strike something. (*Id.*) He reports "the stairs were obstructing the incident." (*Id.*) Mr. Rossignol reported seeing a set of legs rolling on the floor and observed staff running in the unit towards the incident where "something is occurring." (*Id.*) Mr. Townsend was then seen being escorted from the scene by staff while inmate Piankhi-Shabaka was escorted from the scene in a wheelchair with his head "slumped" over to one side. (*Id.*)

Mr. Townsend testified in his own defense. He said that inmate Piankhi-Shabaka, his cellmate, had previously been "disrespectful" and asked him to leave the cell. (*Id.* at ECF p. 10.) On the day of the incident, inmate Piankhi-Shabaka initiated the physical altercation between the two by throwing hot water on him and hitting him with a sock with a lock in it. (*Id.*) Mr. Townsend testified that he did not intend to kill his cellmate, but rather was "trying to 'hold onto' inmate Piankhi-Shabaka so staff could get him." (*Id.* at ECF p. 21.) Mr. Townsend testified he "may have held [inmate Piankhi-Shakaba] in the neck area." (*Id.*)

At the disciplinary hearing DHO Lane "used some evidence contained in staff memorandum referencing the incident." (*Id.* at ECF p. 10.) Staff members responding to the incident reported that although the two inmates were given a direct order to cease fighting, they failed to do so. (*Id.* at ECF p. 10.) Officer Shultz's memorandum noted the physical altercation between the two cellmates occurred following a verbal dispute. (*Id.*) He also reported inmate Piankhi-Shabaka struck Mr. Townsend first and then both inmates began "to grab each other and strike each other with fists. Both inmates fell to the ground and continued to grab each other around the head and body." (*Id.*) Officer Vasquez, who also responded to the incident, filed a memorandum reporting that it "appeared" that Mr. Townsend was "resisting staff and would not let go of inmate Piankhi-Shabaka." (*Id.*) Officer Rivera, reported giving the inmates a direct order to stop fighting but that Mr. Townsend "continued to fight." (*Id.*) "Officer Rivera tried to pull [Mr. Townsend] off inmate Piankhi-Shabaka, but [he] would not let go." (*Id.*) A fourth staff member, "Recreation Specialist Connelly stated he observed Officer Headley pull [Mr. Townsend] off inmate Piankhi-Shabaka." (*Id.*) Additionally, while restraining Mr. Townsend on the floor, Mr. Connelly reported Mr. Townsend yelling at inmate Piankhi-Shabaka "something to the effect of 'That's what you get bitch. I'm getting out. Your bitch ass will stay in prison forever. Fuck your bitch ass.'" (*Id.*)

The DHO also remarked that he used "expert information contained in inmate Piankhi-Shabaka's autopsy report" as evidence of Mr. Townsend's guilt. (*Id.*) The Medical Examiner ruled inmate Piankhi-Shabaka's death a "homicide." The cause

of death was listed as "asphyxia, due to neck compression." (*Id.*)

On June 3, 2011, Mr. Townsend received a copy of a report with the DHO's decision. (*Id.* at ECF p. 12.) He was "informed the element of the prohibited act of killing, Code 100, is to deprive of life." (*Id.* at ECF p. 11.) Relying on "the incident report and investigation," staff memorandum referencing the incident, the autopsy report, as well as Mr. Townsend's admission that he "may have held inmate Piankhi-Shabaka in the neck area," DHO Lane found Mr. Townsend guilty of violating BOP Code 100 offense, killing. (*Id.* at ECF pp. 9-11.) DHO Lane noted that "[a]lthough [Mr. Townsend] said this was not an intentional act there is significant evidence that inmate Piankhi-Shabaka was choked until unconscious." (*Id.*) DHO Lane wrote that "whether intentional or not, holding someone around the neck has the possibility of causing death due to asphyxia. The DHO believes [Mr. Townsend] knew [he] was harming inmate Pianki-Shabaka by holding him around his neck." (*Id.*) The DHO also questioned how Mr. Townsend could claim to be "holding onto" inmate Piankhi-Shabaka until staff arrived, but then did not let him go when staff did arrive. Staff responding to the incident reported that they "had to pull [Mr. Townsend] from inmate Piankhi-Shabaka." (*Id.* at ECF p. 12.)

DHO Lane imposed the following sanctions: (1) 40 days disallowance of Good Conduct Time (GCT); (2) 30 days forfeiture of non-vested Good Time; (3) 60 days disciplinary segregation; and (4) 180 days loss of telephone privileges. (*Id.* at ECF p. 12.) The DHO also recommended a disciplinary transfer. (*Id.*)

### III. Standard of Review

The Due Process Clause of the Fourteenth Amendment protects prisoners from being deprived of life, liberty, or property without due process of law. *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Burns v. PA Dept. of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011). Federal inmates possess a liberty interest in good conduct credits. *Solomon v. Warden, FCI Fairton*, No. 12-1438, 2012 WL 6052002, *1 (3d Cir. Dec. 6, 2012). Accordingly, a challenge to a disciplinary action that resulted in the loss of good time credits is actionable under § 2241 because it affects the duration of the petitioner's sentence. *Queen v. Miner*, 530 F.3d 253, 254 n.2 (3d Cir. 2008).

### IV. Discussion

Mr. Townsend contends his due process rights were violated during the disciplinary process because the BOP: (1) failed to give him adequate written notice of the evidence to be presented against him in advance of the hearing which prevented him from preparing his defense; (2) his staff representative was inadequate; (3) the disciplinary report, and thus the DHO's findings, were based on false reports; and (4) the DHO was not impartial. Mr. Townsend asserts that the DHO did not have sufficient evidence to support his decision.

**A.    Due Process Requirements in Inmate Disciplinary
Proceedings involving Loss of Good Conduct Time.**

Prisoners are guaranteed certain due process protections where a prison disciplinary hearing may result in the loss of good time credits. *Wolff,* 418 U.S. at 564-565, 94 S.Ct. at 2978-79. However, prison disciplinary proceedings are not treated the same as a criminal prosecution, and the entire "panoply of rights due a defendant in such proceedings does not apply" in prison disciplinary proceedings. *Id*. at 556, 94 S.Ct. at 2975.

With respect to a prison disciplinary proceeding implicating the infringement of a cognizable liberty interest, such as the loss of good time credits, the minimum due process protections afforded an inmate include: (1) the right to appear before an impartial decision-making body; (2) twenty-four hours advance written notice of the charges; (3) an opportunity to call witnesses and present documentary evidence in his or her defense when doing so does not threaten institutional safety or correctional goals; (4) assistance from an inmate representative if the charged inmate is illiterate or if "the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case," *Id*. at 570, 94 S.Ct. at 2982; and (5) a written statement by the factfinder citing the evidence relied upon and reasons for the disciplinary action taken. *Id*. at 563-71, 94 S.Ct. at 2978-2982.

Where the due process requirements of *Wolff* are met, the DHO's decision is required to be supported by "some evidence in the record." *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454-56, 105 S.Ct. 2768, 2773-74, 86 L.Ed.2d 356

(1985); *see also Young v. Kann*, 926 F.2d 1396, 1402–03 (3d Cir.1991) (applying *Hill* standard to federal prisoner due process challenges to prison disciplinary proceedings).

### B.    BOP Disciplinary Hearing Regulations

The Bureau of Prisons (BOP) has specific guidelines for inmate discipline procedures which are fully outlined in the Code of Federal Regulations, Title 28 Section 541.10 through 541.23.[3]  These guidelines dictate the manner in which disciplinary action may be taken should an inmate violate, or attempt to violate, institutional rules.  The guidelines are specifically tailored and designed to meet the due process requirements prescribed by the United States Supreme Court in *Wolff*. *See Von Kahl v. Brennan*, 855 F.Supp. 1413, 1418 (M.D. Pa. 1994).

When BOP staff believe an inmate has committed a prohibited act, an incident report must be prepared and referred for investigation.  28 C.F.R. § 541.14 (2010).  After investigation, the matter is referred to the UDC for a hearing pursuant to 28 C.F.R. § 541.15 (2010).  If the UDC finds that a prisoner has committed a prohibited act, it may impose minor sanctions.  If the alleged violation is serious and warrants consideration for more than minor sanctions, or involves a prohibited act listed in the greatest or high category of offenses, the UDC refers the matter to a

---

[3]  The BOP revised this section of Title 28 at 28 C.F.R. §§ 541 through 541.8, effective June 20, 2011.  While the numbering of the regulations have changed, the substance of the regulations basically remained the same with respect to the disciplinary review process.  The Court notes that all citations in this Order to the Code of Federal Regulations reference the 2010 version of the regulations which were applicable during Mr. Townsend's disciplinary proceedings.

DHO for a hearing.  28 C.F.R. § 541.15(f) (2010).  High category offenses carry a possible sanction of loss of good conduct time credits, *inter alia*, 28 C.F.R. § 541.13.

The DHO then has the authority to dismiss any charge, to find a prohibited act was committed, and to impose any available sanction for the act.  28 C.F.R. § 541.18 (2010).  The DHO hearing is conducted pursuant to the procedures set forth at 28 C.F.R. § 541.17 (2010).  At the DHO hearing, the inmate is entitled to make a statement and present documentary evidence.  The inmate also has the right to request witnesses and have them called to testify.  The DHO shall call those witnesses who have information directly relevant to the charges and who are reasonably available.  The inmate has the right to be present throughout the DHO hearing except during deliberation or when institutional security would be jeopardized.  28 C.F.R. 541.17 (d) (2010).

In addition, the regulations also set forth guidelines for how a decision shall be rendered. "The decision of the DHO shall be based on at least some facts, and if there is conflicting evidence, it must be based on the greater weight of the evidence." 28 C.F.R. § 541.17(f) (2010).  The DHO is required to keep a record of the proceedings, whereby the record is "sufficient to document the advisement of inmate rights, the DHO's findings, the DHO's decision and the specific evidence relied on by the DHO, and must include a brief statement of the reasons for the sanctions imposed."  28 C.F.R. § 541.17(g) (2010).  The prisoner must be given a written copy of the disposition, ordinarily within 10 days of the decision. 28 C.F.R. § 541.17(g) (2010).

### C.    Alleged Procedural Due Process Violations

The Court now addresses Mr. Townsend's procedural due process challenges to his disciplinary hearing.

First, Mr. Townsend argues that the Incident Report, charging him with killing inmate Pianki-Shabaka, did not provide him with adequate notice of the information the DHO would be relying on in reaching his decision.  Specifically, Mr. Townsend objects to the DHO's reliance on staff reports by Officers Shultz, Rivera and Vasquez who reported that Mr. Townsend did not release Piankhi-Shabaka when directed to do so, that he "resisted" responding staff,  and ultimately was physically "pulled off" of his cellmate by staff.  (Doc. 14, Traverse at ECF p. 5.)  He claims without advance knowledge of these statements he could not mount an adequate defense to the charge.  (*Id*.)

Under *Wolff,* "written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense." *Wolff*, 418 U.S. at 564, 94 S.Ct. at 2979. "Notably absent from the *Wolff* list of due process rights is a prisoner's right to review all potentially inculpatory evidence prior to the disciplinary hearing ..." *Lasko v. Holt*, 334 F. App'x 474, 476 (3d Cir. 2009).  Thus, although Mr. Townsend suggests he was ambushed by failure of the inclusion of the responding officers' statements in the Incident Report, he is mistaken.  Moreover, the Incident Report did reflect that "Responding staff separated the inmates."  (Doc. 11-2 at ECF p. 15). This language, within the Incident Report, clearly placed Mr. Townsend on notice of

the existence of evidence that contradicted his assertion that he used only the minimum amount of force necessary against inmate Piankhi-Shabaka to hold him off until staff arrived. Additionally, Mr. Townsend concedes that his staff representative, Mr. Rossignol, "had possession of all staff memos/reports" related to the incident in advance of his disciplinary hearing. (Doc. 14 at ECF p. 7.)

Likewise, Mr. Townsend's assertion that his lack of advance knowledge of the officer's report deprived him of potentially exculpatory evidence in this matter that would have impacted the outcome of his disciplinary hearing is unfounded. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." As noted earlier, prison disciplinary proceedings are not part of a criminal prosecution and the full array of rights due a defendant in such proceedings does not apply. *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2975. Here, although Mr. Townsend did not request disclosure of the investigative report or supporting memorandum in advance of the disciplinary hearing, it is uncontested that his staff representative had access to this information in advance of the disciplinary hearing. Thus, this is not the situation where the BOP ignored an inmate's request to present evidence for consideration, or that was not otherwise considered, by the DHO. Also, it is undisputed that the sum of the officers' statements contradicted Mr. Townsend's claim of self-defense. The officers' memorandum clearly did not provide information favorable to Mr. Townsend. Finally, Mr. Townsend does not suggest how he was prejudiced by the lack of

knowledge of officers' individual statements which confirmed the language of the Incident Report that staff had to separate Mr. Townsend and inmate Piankhi-Shabaka rather than him freely releasing his cellmate upon the arrival of staff. As he fails to explain why he was unable to "marshal the facts and prepare a defense" based on the notice he received via the Incident Report, he fails to establish that the notice in the incident given did not satisfy the due process requirements. *Wolff*, 418 U.S. at 564, 94 S.Ct. at 2978.

Next, Mr. Townsend alleges he received inadequate representation from his staff representative because Mr. Rossignol failed to meet with him in advance of the disciplinary hearing, failed to marshal a defense on his behalf, and failed to share the investigative report and staff memorandum of the incident with him. It is well established that prisoners do not have a due process right of confrontation and cross-examination, or a right to counsel, in prison disciplinary proceedings. *Wolff*, 418 U.S. at 569-70, 94 S.Ct. at 2981-82. Instead, due process requires that an inmate be provided with the aid of a staff representative only where the inmate is illiterate or "the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case." *Wolff*, 418 U.S. at 570, 94 S.Ct. at 2982. Neither of the above factors are applicable to Mr. Townsend's case. Mr. Townsend is not illiterate, nor does he contend to be. Furthermore, at the outset of the disciplinary hearing Mr. Townsend confirmed that he understood his due process rights and that he was ready to proceed with the hearing. *See* Doc. 11-2 at ECF p. 9. Based on this evidence there is no indication that Mr. Townsend suffered from a medical, mental health or other

disability that would have vested him with a right to staff assistance under *Wolff*.[4]

Likewise, here the sole issue is whether Mr. Townsend's interaction with inmate

Piankhi-Shabaka led to his death. Contrary to Mr. Townsend's belief, intent is not

an issue. As clarified by DHO Lane, "the element of the prohibited act of killing,

Code 100, is to deprive of life." (Doc. 11-2 at ECF p. 11.) Accordingly, we do not

find the facts involved in this case are complex requiring the appointment of staff

representation. Where there is no right to staff assistance, there can be no due

process violation based on inadequate staff assistance. *Wolff*, 418 U.S. at 570, 94

S.Ct. at 2982.

To the extent Mr. Townsend alleges his staff representative was ineffective,

this assertion also fails to state a due process claim. Although not constitutionally

mandated, Mr. Townsend was afforded staff representation pursuant to BOP policy.

Being afforded a staff representative does not necessarily make Mr. Townsend's

challenge to the adequacy of Mr. Rossignol's representation rise to the level of a

due process claim.[5] Here, although Mr. Townsend contends he never "met" with his

---

[4] Mr. Townsend raises the issue of his mental competency, or rather incompetency, for the first time in his Traverse. He suggests due to untreated depression, post traumatic stress syndrome, and migraines, he was incompetent at the time of his disciplinary hearing. There is no evidence in the record that he raised the issue of his competency before the UDC or at his disciplinary hearing. Mr. Townsend's self-serving statement do not provide any evidence of his alleged incompetency at the time of his disciplinary hearing. *See Milhouse v. Bledsoe*, No. 1:CV-10-1974, 2011 WL 1344580, at *3 (M.D. Pa. Apr. 8, 2011).

[5] Absent a showing of prejudice, a technical violation of BOP regulations does not automatically require that a disciplinary sanction must be vacated and remanded. *Von Kahl*, 855 F. Supp. at 1421 (finding that in a federal inmate disciplinary proceeding "where the minimal requirements of due process have been met, an inmate must show prejudice to the rights sought to be protected by the regulation claimed to be violated" in order to obtain

(continued...)

staff representative, he does admit that he and Mr. Rossignol had "a short conversation through [his] cell door" in advance of the hearing. (Doc. 14 at ECF pp. 6-7.) Mr. Rossignol also appeared at the disciplinary hearing and testified on Mr. Townsend's behalf. Mr. Townsend also acknowledges that Mr. Rossignol had access to the SIS investigation and supporting memorandum, and reviewed the video tape of the incident. (Doc. 14 at ECF pp. 6-7.) Mr. Townsend, however, criticizes Mr. Rossignol's decision not to offer the staff officer's statements into evidence at the hearing. While he may have disagreed with Mr. Rossignol's strategy, his decision not to highlight inculpatory evidence that would not support Mr. Townsend's theory of self-defense, does not assert a due process claim. Mr. Rossingol was not enlisted to act as Mr. Townsend's counsel, nor does *Wolff* require him to serve in that capacity. *Wolff*, 418 U.S. at 556 and 570, 94 S.Ct. at 2975 and 2982. As there is no right to assistance of counsel in a prison disciplinary proceeding, it necessarily follows that Mr. Townsend has no cognizable claim of ineffective assistance of counsel by an assisting staff member in that context for the purpose of habeas relief. *See Bostic v. Carlson*, 884 F.2d 1267, 1274 (9th Cir. 1989).

It is also alleged that Mr. Townsend's due process rights were violated because the DHO officer did not personally review the videotape of the incident. Mr. Townsend does not dispute that his representative, Mr. Rossignol, reviewed the

[5](...continued)
habeas relief); *Macia v. Williamson*, 219 F. App'x 229, 233 (3d Cir. 2007)(same).

tape and testified at the hearing as to what he saw.[6]  There is no evidence within the

DHO's report that either Mr. Rossignol or Mr. Townsend requested DHO Lane

personally review the videotape before or during the disciplinary hearing.[7]  Contrary

to Mr. Townsend's assertion, there is also no evidence in the record that he or his

representative sought to postpone the disciplinary hearing for the purpose of the

DHO reviewing the videotape.  Given these facts, Mr. Townsend has not carried his

burden to establish a due process violation due to the DHO not viewing the

videotape of the incident.

Mr. Townsend also argues his due process rights were violated because the

incident report was based on false information provided by the responding officers.

He argues that his staff representative's testimony recounting the video of the

incident affirms that he did not initiate the fight between himself and inmate Piankhi-

Shabaka and that his actions were in self-defense.  (Doc. 14, Traverse at ECF p. 4.)

He suggests this testimony negates Officer Shultz's report of the chronology of the

events and thus discredits this officer's statement.  (*Id*.)  DHO Lane relied upon

Officer Shultz's report to the extent that following inmate Piankhi-Shabaka's initiation

of physical contact with Mr. Townsend, both inmates then engaged in grabbing and

hitting each other "and continued to grab each other around the head and body"

---

[6]  *See Howard v. Werlinger*, 403 F. App'x 776 (3d Cir. 2010)(No due process
violation where DHO refused to view video footage of incident and relied on officer's review
of footage noting inmate's staff representative also viewed the video).

[7]  "Therefore, because the DHO had no opportunity to consider the issue, [Mr.
Townsend] cannot now claim that the DHO did not consider all the evidence.  *See
McPherson v. McBride*, 188 F.3d 784, 786 (7th Cir. 1999)(due process does not require "the
consideration of evidence that could have been but was not presented at the hearing.")"
*Milhouse v. Bledsoe*, No. 1:CV-10-1974, 2011 WL 1344580, at *3 (M.D. Pa. Apr. 8, 2011).

even though given a direct order to stop fighting. (Doc. 11-2 at ECF p. 10 and p. 27.) There is simply no evidence that Officer Shultz's reporting of these event, even if not in correct chronological order as suggested by Mr. Townsend, were false. Additionally, Officer Shultz's statement that Mr. Townsend continued to fight with the victim is consistent with the statements of at least three other BOP staff members who responded to the event. To the extent Mr. Townsend seeks this Court to make an assessment of the credibility of the officers' statements, we cannot do so as as this is not part of the federal inquiry in reviewing disciplinary proceedings. *See Hill, 472 U.S. at 455, 105 S.Ct. at 2773* (It is not the function of the court to conduct an "examination of the entire record, independent assessment of the credibility of witnesses, or even a weighing of the evidence." It is the role of this Court to determine that the DHO's decision relied on "some evidence," not question the DHO's determination of the reliability of the evidence that was presented. Accordingly, this claim is without merit.

Mr Townsend's final due process claims relates to the impartiality of DHO Lane. He suggests DHO Lane was not impartial because he knowingly relied on false claims and failed to continue the hearing "when informed of the falsities." (Doc. 1 at ECF p. 4.) "In order to insure impartiality, the DHO may not be the reporting officer, investigating officer, or UDC member, or a witness to the incident or play any significant part in having the charge(s) referred to the DHO." 28 C.F.R. § 541.16(b). DHO Lane was not alleged to have been involved in any aspect of witnessing, reporting, investigating or playing any part in having the charge referred to the DHO. As Respondents note, Mr. Townsend's claim of DHO Lane's

impartiality is unsupported and amounts to no more than an assertion of bias. (Doc. 11 at ECF p. 12.) The courts have held that a "generalized critique" of staff impartiality is insufficient to demonstrate the degree of bias necessary to prove a due process violation. *Lasko,* 334 F. App'x at 476. Furthermore, in the absence of a showing that the hearing officer was "personally or substantially involved in the circumstances underlying [the investigation of the] charge," *Greer v. Hogston*, 288 F. App'x 797, 799 (3d Cir. 2008), courts generally decline to sustain due process challenges to disciplinary decisions on claims of staff bias. *See Redding v. Holt*, 252 F. App'x 488 (3d Cir. 2007). Accordingly, the record of these disciplinary proceedings affirmatively reveal that Mr. Townsend was afforded all the rights set forth in *Wolff.*

### D. Substantive Due Process Claim - Sufficiency of the Evidence

Where the due process requirements of *Wolff* are met, the DHO's decision is required to be supported by "some evidence in the record." *Hill*, 472 U.S. at 454-56, 105 S.Ct. at 2773-74; *see also Young v. Kann*, 926 F.2d 1396, 1402–03 (3d Cir.1991) (applying *Hill* standard to federal prisoner due process challenges to prison disciplinary proceedings). A determination of whether this standard is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or even a weighing of the evidence. Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board." *See Hill*, 472 U.S.

-18-

at 455, 105 S.Ct. at 2773 (emphasis added); *Thompson v. Owens*, 889 F.2d 500, 502 (3d Cir. 1989). Under *Hill*, judicial review of a prison disciplinary decision is limited to ensuring that the prisoner was afforded certain procedures, the action against him was not arbitrary, and that the ultimate decision has some evidentiary support. *Hill*, 472 U.S. at 457, 105 S.Ct. at 2775; *see also* 28 C.F.R. § 541.8(f) (requiring that the DHO's decision be "based upon at least some facts and, if there is conflicting evidence, on the greater weight of the evidence.") Moreover, "[t]he sufficiency standard is met where a DHO supports a finding of culpability solely by reference to an incident report compiled by a corrections officer." *Moles v. Holt*, 221 F. App'x 92, 94 (3d Cir. 2007)(citations omitted).

Here Mr. Townsend was charged with a disciplinary offense and not a federal or state crime, which may contain a specific intent requirement. Again, prison disciplinary proceedings are not criminal prosecutions and a prisoner is not afforded the full panoply of rights which accompany a criminal prosecution. *Wolff*, 418 U.S. at 556, 94 S.Ct. at 2975. Therefore, the DHO did not have to find that Mr. Townsend committed the disciplinary offense of killing "beyond a reasonable doubt." Similarly, there was no requirement that the DHO find that Mr. Townsend had the specific intent to kill inmate Pianhki-Shabaka.

In this case, the DHO relied upon eyewitness reports that while inmate Piankhi-Shabaka initiated the physical altercation, and inmate Piankhi-Shabaka's death may have been unintended, Mr. Townsend's action of holding inmate Piankhi-Shabaka around the neck, and refusing to release him when ordered, negatively impacted his ability to breathe. Additionally, the DHO relied upon the autopsy report

-19-

which confirmed that inmate Pianhki-Shabaka died of asphyxiation due to neck compression. (Doc. 11-2 at ECF p. 10.) The fact remains that there is "some evidence" to suggest that Mr. Townsend guilty of Code 100, the killing of inmate Pianhki-Shabaka.[8]

Lastly, Mr. Townsend contends that as it is uncontested that inmate Piankhi-Shabaka initiated the fight, his actions, which may have unfortunately resulted in his cellmate's death, were taken in self-defense precluding any finding of guilt. In the prison disciplinary setting, he is mistaken. Inmates do not have a constitutional right to raise self-defense as a defense in the context of prison disciplinary proceedings. *Jones v. Cross*, 637 F.3d 841, 848 (7th Cir. 2011). As noted earlier, the issue of intent to harm is not relevant to what Mr. Townsend was charged with killing. The necessary element of the charge, as set forth by the DHO, is "to deprive of life." Mr. Townsend was permitted to argue self-defense at his hearing. However, as found by the DHO, there is more than "some evidence" in the record to conclude that Mr. Townsend's actions resulted in inmate Piankhi-Shabaka being deprived of his life. The fact that Mr. Townsend did not intend to harm his cellmate, is of no import given the outcome of his actions. Multiple responding officers reported that Mr. Townsend did not release inmate Piankhi-Shabaka when ordered to do so, that he "resisted" staff efforts to pull him off of inmate Piankhi-Shabaka, and that staff physically separated him from inmate Piankhi-Shabaka. (*Id*. at ECF pp. 10-11.)

_____

[8] While Mr. Townsend suggests that inmate Pianhki-Shabaka was still alive after their altercation, and that prison official's actions of improperly moving via a wheelchair rather than a backboard caused his breathing difficulties rather than his self-defense maneuvers, this allegation is not supported by the record or the autopsy report.

Given the totality of the circumstances, the DHO found the greater weight of the evidence supported a finding that Mr. Townsend was guilty of killing inmate Pianhki-Shabaka.  It is apparent upon review of the record that the DHO's decision was based on "the greater weight of the evidence" and that the DHO properly documented his findings and specific evidence relied on in reaching those findings as required by 28 C.F.R. § 541.17(g) (2010).

## V.      Conclusion

For the reasons set forth above, Mr. Townsend's challenges to the disciplinary proceedings do not amount to a constitutional due process violation. Accordingly, the Petition for Writ of Habeas Corpus will be denied.  Given our resolution of Mr. Townsend's habeas corpus petition, his Motion for a Temporary Restraining Order preventing his transfer from the Middle District of Pennsylvania, and his Motion for Hearing to resolve his motion for a temporary restraining order are moot.  An appropriate order follows.

**/s/ A. Richard Caputo**
**A. RICHARD CAPUTO**
**United States District Judge**

**Dated: January 30, 2013**